IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Compass Homes, Inc.,

        Plaintiffs,

v.

Trinity Health Group, Ltd., et al.,

        Defendants.

Case No. 2:13-cv-647

Judge Graham

<u>Opinion and Order</u>

Plaintiff Compass Homes, Inc. brings this action for copyright infringement relating to floor plans it designed for a single family residence. Compass designed the plans for a married couple, defendants Thomas and Angela McDermott, who later decided not to build their home through Compass. The McDermotts instead turned to defendant Trinity Health Group, Ltd. to help them design and build their home. Compass alleges that Trinity designed a home that is substantially similar to the Compass design.

This matter is before the court on the parties' cross-motions for summary judgment. For the reasons stated below, the motions are denied as to the issue of whether the defendants' plans are substantially similarity to the Compass plans, but the defendants' motions are granted on the issue of whether Compass is entitled to recover statutory damages and attorney's fees.

**I.    Background**

Thomas and Angela McDermott had long hoped to someday build their "dream home." They made note of designs, ideas and features they liked, and Mrs. McDermott kept a "big, thick" binder full of information, including articles, photographs and advertisements gathered from magazines and online resources, as well as handouts obtained from Parade of Homes events and model homes. (Dep. of A. McDermott at 62).

In late 2011, the McDermotts reached the point of deciding to go forward with the process of building a new home. Mr. McDemott said that they had viewed a house for sale which "had some of the features we wanted in our dream home." (Dep. of T. McDermott at 25). Upon

learning that Compass Homes had designed the house, the McDermotts contacted Compass and arranged a meeting.

The McDermotts met with Pam Cinelli of Compass on December 16, 2011 at a Compass model home in Olentangy Crossings, a community in Delaware County, Ohio where the McDermotts planned to build their home. The McDermotts expressed their desire to have a home of about the same size and with some of the same features as the Compass-designed house which they had seen for sale. At this meeting, the McDermotts and Cinelli went over the features and design elements that the McDermotts wanted, with the goal of determining whether Compass could build the home within their budget.

On December 29, 2011, the McDermotts met with Cinelli and Mark Braunsdorf, the President and CEO of Compass, for an hour to an hour-and-a-half. They worked off of a three-page floor plan that Compass had drawn up (either the floor plans for the Compass-designed house which the McDermotts had seen for sale or a modified version of those plans), discussing changes that the McDermotts wanted to make. According to Braunsdorf, the McDermotts "had minimal comments about the floor plan because what they saw, they loved." (Dep. of Braunsdorf at 331). According to Mrs. McDermott, she and Braunsdorf went room by room, discussing the modifications and additions that she wanted to be made. "Mark and I would mark on there ideas. We can put this here, we can put the toilet there. Oh, can you flip this sink over here?" (Dep. of A. McDermott at 44). Among the other changes that she requested was to make one of the bathrooms handicap-accessible, to move the sliding doors in the morning room to the other side of the room, and to create a niche in the foyer for a large piece of furniture. (Id. at 41-43). Braunsdorf and the McDermotts discussed how these modifications would affect the price of the house.

It is unclear when Compass first presented the McDermotts with "The McDermott Residence" floor plans, which Braunsdorf prepared on his computer and for which Compass claims a copyright interest. At the latest, Braunsdorf emailed the plans to the McDermotts on January 14, 2012, noting that he had made "the additional revisions we discussed at out last meeting." (Pl.'s Ex. 46). The plans included: (1) a first floor with a foyer, dining room, study, great room, bedroom, kitchen, morning room, mudroom, pocket office, bathroom, covered front porch, two car garage and a separate one car garage; (2) a second floor with a master bedroom suite (closet and bathroom), three additional bedrooms, laundry, bonus room, Jack and Jill bathroom and one additional full bathroom; and (3) a front elevation (or exterior) view indicating a covered front porch and mixed

exterior finish of siding, stone and shaker shingles. (First Am. Compl., Ex. A). Though the plans do not indicate an overall square footage, they do contain size dimensions for the major rooms.

Included on each page of The McDemott Residence plans was a copyright notice. The notice, with a copyright year of 2011, stated that the plans were "the original and unpublished work of Compass Homes, Inc." and could not be copied, used or disclosed to a third party without the consent of Compass.

Mrs. McDermott emailed Braunsdorf on January 16, 2012 acknowledging receipt of the Compass plans. She expressed concern that "the home we would like to build with you is outside of our budget. I will continue to think about what changes I might be able to make and feel good about." (Pl.'s Ex. 46). As it would turn out, Braunsdorf did not hear again from the McDermotts. They felt uncomfortable with Compass, based on their perception that Compass "bounced around" its price estimates, failed to timely communicate with them and seemed not to want to build their house.

Compass registered the McDermott Residence as an architectural work with the United States Copyright Office on February 17, 2012. The copyrighted work includes the first and second floor plans and the front elevation view. (First Am. Compl., Exs. A and B).

The McDermotts soon started looking for other home designers. One of the contacts they made was with Bob Gesing, a business acquaintance of Mr. McDermott and co-owner of Trinity Health Group. Trinity is in the business of providing design and architectural services for the healthcare industry. When Mr. McDermott asked Gesing for a recommendation, Gesing offered that Trinity itself could help them. Mr. McDermott inquired whether Trinity had worked before on residential designs. Gesing responded that his wife Cheryl liked to design homes. Mrs. Gesing earned a Bachelor of Science degree in architecture and had previously worked in the healthcare sector as a planner and designer. She was not an employee of Trinity at the time of the events at issue in this case.

The McDermotts and the Gesings met on February 14, 2012. Mrs. McDermott brought her large binder, as well as the Compass plans. The McDermotts communicated a "laundry list of things that [they] wanted in [their] house." (Dep. of A. McDermott at 62). The McDermotts showed the Compass plans, as well as other floor plans and photographs, to the Gesings during the meeting. Mrs. Gesing agreed to try to help out the McDermotts by designing their home.

On the morning of February 15, 2012, Mrs. McDermott emailed a copy of the Compass plans to Mrs. Gesing. She wrote, "I've attached the floor plans that I showed you last night as well

3

as some photos. I may have not mentioned that on these plans there is a bench in the mudroom that I would like removed." (Defs.' Ex. W). The plans that were emailed had the Compass name and copyright notice on them.

Mrs. Gesing viewed the email and the attached floor plans on the day it was sent. However, she denies having seen the Compass name or copyright on the plans. (Dep. of C. Gesing at 51). Using the Compass plans as a reference and "something to start with," Mrs. Gesing prepared hand-sketched floor plans. (Id. at 49 ("I didn't have anything to start sketching from until she emailed to me.")). Mrs. Gesing's sketches were drawn free-hand, such that she did not trace over the Compass plans. (Id. at 66).

Mrs. Gesing emailed Mrs. McDermott on February 16, 2012. Referring to the Compass plans that Mrs. McDermott had emailed to her, Mrs. Gesing noted, "I have looked at the plans and spent some time sketching . . . rough and quick." (Defs.' Ex. X). She attached her sketches of floor plans for a basement, first floor and second floor. Mrs. Gesing's plan for the first floor, while not drawn to scale, contained the same rooms and room arrangement as the Compass floor plan. Mrs. Gesing's plan for the second floor also contained the same rooms and nearly the same arrangement as the Compass second floor plan, with some variation in the arrangement of the bathroom and closet in the master bedroom and the arrangement of the Jack and Jill bathroom. In the text of the email, Mrs. Gesing stated that she had modified the "original" plans in several ways, including adding one foot to the overall width of the house, increasing the size of both garages and altering the layouts of the master suite and the Jack and Jill bathroom. (Id.).

In the February 16 email, Mrs. Gesing also reported that she had "forwarded the plans you sent to our office to have the guys get them to a scalable size so that I can actually measure the rooms." (Id.). Mrs. Gesing did in fact send the Compass plans to someone at Trinity so that they could "bring it up so that it was an eighth-inch scale or a quarter-inch scale," "something that [she] could draw on top of and measure for size." (Dep. of C. Gesing at 59). A draftsperson at Trinity, likely Daniel Thornton, prepared a "scaled-up" version of the plans. (Dep. of A. Vogel at 72).

The Gesings then left for vacation. Mrs. Gesing and Mrs. McDermott resumed communications in late February. On February 28, Mrs. McDermott emailed notes that she had written on Mrs. Gesing's sketches. (Defs.' Ex. Y). These notes reflected changes that Mrs. McDermott wanted to make or questions that she had.

On March 2, 2012, Mrs. Gesing emailed to the McDermotts a set of floor plans that she drew by hand to scale. She prepared these plans in part by taking Trinity's scaled-up version of the

4

Compass plans and drawing on top of them. (Dep. of C. Gesing at 75-77). Her first floor plan again featured the same primary rooms and room arrangement as the Compass plan, but with the pocket office eliminated in favor of a larger mudroom. (Defs.' Ex. Z). Her first floor plan included room dimensions that were similar to, or sometimes larger than, the Compass room dimensions. The second floor plan had the same rooms and largely the same arrangement as the Compass plan, again with some variation in the arrangement of the master bathroom and closet and of the Jack and Jill bathroom. Mrs. Gesing prepared an "option" second floor plan that reworked either the orientation or the placement of the laundry, master bedroom closet, Jack and Jill bathroom, another bathroom and certain other closets, as well as slightly changed the dimensions of the bedrooms.

After additional communication between Mrs. Gesing and Mrs. McDermott, Mrs. Gesing sent an email on March 7, 2012 to Andrew Vogel, Vice President of Trinity, reporting that "the layout is set" on the McDermotts' house. (Defs.' Ex. LL). She attached her scaled floor plan drawings, which indicated that the McDermotts had decided on the "option" plan for the second floor. Vogel forwarded the email to Joel Ronschke, an interior design director at Trinity, with the instruction that he could get started on the project. (Id.). Vogel began sketching the elevation views of the house. Vogel testified that he never saw any documents that had the Compass name on them while he worked on the McDermotts' home design. (Dep. of A. Vogel at 42).

Vogel, Ronschke and Thornton worked further on the plans drawn by Mrs. Gesing. They enlarged, or bumped out, the two car garage and reduced the length of the covered front porch. They made other "minor changes," including adjusting a door location and adding a landing at the bottom of the stairs. (Dep. of A. Vogel at 53-54). They prepared computer-generated floor plans dated March 14, 2012 and emailed them to Mrs. Gesing and Mrs. McDermott for their review. (Defs.' Ex. AA). On March 16, Trinity issued a new set of plans to reflect a slight reduction in the overall square footage of the house. (Defs.' Ex. BB).

On July 24, 2012 Trinity produced a more comprehensive set of plans in connection with an application for a construction permit. The set included floor plans for the first and second floors and for a lower level, as well as a site plan, foundation plan, roof plan, framing plan, electrical plan, exterior elevations, wall sections and building sections. (Defs.' Ex. OO). The complaint alleges that it is this July 24 set of plans that infringes on Compass's copyright.

The McDermotts hired Total Cleaning and P.O. LLC as a general contractor and Shirk & O'Donovan Consulting Engineers, Inc. as a structural engineer. Construction began in 2012 and the McDermotts moved into their new home in May 2013.

Compass brought suit against the McDermotts, Trinity, Total Cleaning, Shirk & O'Donovan and Arrow Heating and Cooling Mechanical, Inc. for copyright infringement, unjust enrichment, conversion and tortious interference with business relations. The court, on defendants' motions to dismiss, dismissed the unjust enrichment and conversion claims on the grounds that they were preempted under 17 U.S.C. § 301. Defendants Total Cleaning and Arrow Heating have been voluntarily dismissed from this action.

The parties filed cross-motions for summary judgment. Compass moves for summary judgment on its copyright infringement claim, arguing that as a matter of law the Trinity design is substantially similar to the Compass design. The McDermotts make the opposite argument in their motion for summary judgment, contending that the two designs are not substantially similar as a matter of law. The McDermotts, Trinity and Shirk & O'Donovan all move for summary judgment on a discrete issue of damages, arguing that Compass is barred from seeking statutory damages and attorney's fees because it failed to register its copyright prior to the commencement of the alleged infringement. Finally, Shirk & O'Donovan moves for summary judgment on the grounds that it did not participate in the alleged copyright infringement.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence"

to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

Copyright protection subsists in "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Included in the scope of copyright protection are "architectural works." Id., § 102(a)(8). An "architectural work" is "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101. "The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." Id.

In order to prevail on a copyright infringement action, a plaintiff must establish that it owns a valid copyright and that the defendant copied "constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see also Kohus v. Mariol, 328 F.3d 848, 853 (6th Cir. 2003).

#### A. Ownership of a Valid Copyright

The Copyright Act provides that a "certificate of [copyright] registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c).

7

Compass argues that it has established that it owns a valid copyright in the Compass plans for the McDermott Residence. Compass registered the plans as an architectural work, and it maintains that defendants are unable to rebut the presumption created under § 410(c).

The McDermotts oppose this argument because they contend that Mrs. McDermott authored much of the floor plans and that, at a minimum, she is a joint owner of the work. They argue that Mrs. McDermott was responsible for "[v]irtually every design element" in the plans. (Doc. 118 at 6).

The McDermotts' argument is not well-taken. Compass has demonstrated that when Cinelli and Braunsdorf met with the McDermotts, they worked off of an existing Compass floor plan which the McDermotts liked. In asserting that Mrs. McDermott should be credited with "virtually every design element" of the plans, defendants' brief cites to her account of the December 29, 2011 meeting. But her deposition testimony establishes only that she provided input about what features she wanted and where she wanted them placed. For instance, she testified that she "wanted a window put where the sliders had been" and wanted "a handicap accessible bathroom," "a closet [in the mudroom] to hang my coat, a bench to put my shoes on," "a porch deep enough to put furniture on," "the laundry room on the second floor." (Dep. of A. McDermott at 41-43).

Far from designing or drawing the floor plans, Mrs. McDermott simply conveyed to Compass her self-described "laundry list of things" she wanted in her house. As Mr. McDermott testified, "[W]e sat down and brought the ideas." (Dep. of T. McDermott at 73). "Yet copyright protection extends only to a particular expression of an idea, and not to the idea itself." Boisson v. Banian, Ltd, 273 F.3d 262, 268 (2d Cir. 2001. Mrs. McDermott's communication of her ideas and preferences for adapting the existing Compass floor plan did not make her a coauthor of the copyrighted plans. See e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493 (11th Cir. 1990) (holding that a homeowner who provided significant input into home plans was not a coauthor of architectural plans); Aitken, Hazen, et al. v. Empire Construction Co., 542 F.Supp. 252, 259 (D. Neb. 1982) ("Such involvement by a client in the preparation of architectural plans is normally expected. . . . Such involvement does not, however, ordinarily render the client an 'author' of the architectural plans."); HRH Architects, Inc. v. Lansing, No. 1:08-CV-1479-RLV, 2009 WL 1421217, at *5 (N.D. Ga. Apr. 22, 2009) (rejecting, as a matter of law, defendant's claim of co-ownership in building design based on having conceived "the *idea* of how Design A should look" because "[a] work is created only when it is fixed in a final work product") (emphasis in original).

Mrs. McDermott testified that, together with Braunsdorf, she "drew" on a preliminary version of the floor plans. But when asked to clarify or explain her answer, she stated that she simply put marks to show where she wanted certain features like a toilet and a sink to be located. In sum, the evidence is uncontroverted that it was Braunsdorf who put the ideas to expression by designing the copyrighted floor plans on a Compass computer. (Dep. of A. McDermott at 44-45 (testifying that she saw Braunsdorf prepare the plans on his computer); Dep. of T. McDermott at 73-74; Dep. of Braunsdorf at 325-31).

Next, the McDermotts contend that the Compass copyright is not valid because it is not original. They emphasize that Braunsdorf is not a licensed architect. They further cite his deposition testimony in which he, when pressed to identify what was "unique" about the floor plans, named features that defendants claim are common or standard. Again, the McDermotts' argument is not well-taken. The Copyright Act contains no "expertise" requirement; that is, the originality requirement does not demand the authorship of an expert or specialist. The Compass floor plans are not removed from copyright protection merely because Braunsdorf is not an architect. Moreover, the Copyright Act requires originality, not uniqueness. Feist, 499 U.S. at 345. As one court put it, originality does not "connote novelty or uniqueness." Hutchinson Tel. Co. v. Fronteer Directory Co., 770 F.2d 128, 131 (8th Cir. 1985); accord FragranceNet.com, Inc. v. FragranceX.com, Inc., 679 F. Supp.2d 312, 318 (E.D.N.Y. 2010) ("The originality requirement does not demand that the work for which copyright protection is sought be either novel or unique.").

Concerning originality, the Supreme Court has held that "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." Feist, 499 U.S. at 345 (internal quotations omitted); see also Gaste v. Kaiserman, 863 F.2d 1061, 1066 (2d Cir. 1988) ("[T]he originality requirement for obtaining a copyright is an extremely low threshold, unlike the novelty requirement for securing a patent. Sufficient originality for copyright purposes amounts to little more than a prohibition of actual copying."). With regard to architectural works, originality can be expressed in the "overall form" and "arrangement and composition of spaces." 17 U.S.C. § 101.

It is well established that floor plans for a single family house are protectable. See John Alden Homes, Inc. v. Kangas, 142 F.Supp.2d 1338, 1343 (M.D. Fla. 2001) (citing cases); Richmond Homes Mgmt., Inc. v. Raintree, Inc., 862 F. Supp. 1517, 1527 (W.D. Va. 1994), *rev'd in part on other grounds*, 66 F.3d 316 (4th Cir. 1995) ("Infringement can be established on the basis of infringing

either the floor plans or the exterior, or both.") (citing cases). Trinity and Shirk & O'Donovan argue, without citing any supporting authority, that the Compass plans are not protectable because they are not blueprints from which a house could actually be built. This argument is contrary to both the case law, see John Alden Homes and Richmond Homes, supra, which recognizes protection in floor plans, and to the Copyright Act, which extends protection to "drawings" of the design of a building, 17 U.S.C. § 101. See also Frank Betz Assocs., Inc. v. J.O. Clark Const., L.L.C., No. 3:08-cv-00159, 2010 WL 2253541, at *12 (M.D. Tenn. May 30, 2010) ("The Court rejects JOC's argument that 'the test for locating the boundary between idea and expression of idea for an architectural work depicted in drawings should be whether the drawings fully reveal the complete design and do not leave opportunities for, or require, the builder to make choices in completing the construction of a building,' as unsupported by the law in this area.").

Compass's floor and elevation plans for a two-story home represent an arrangement and composition of spaces consisting of five bedrooms, four bathrooms, ten other rooms, multiple closets, two garages and a front porch. The plans also represent an arrangement of various other elements, including doors, windows, coffered and tray ceilings, a fireplace and a kitchen island. Compass's work easily satisfies the requirement of "some minimal degree of creativity."[1] Feist, 499 U.S. at 345; see also Design Basics, L.L.C. v. DeShano Companies, Inc., No. 10-14419, 2012 WL 4321313, at *7 (E.D. Mich. Sept. 21, 2012) ("When Plaintiff's houseplans are viewed as a whole; original, protectable work exists. The house's perimeter, establishing dimension and shape – along with the juxtaposition and arrangement of interior walls, bedrooms, kitchens, bathrooms, windows, doors, laundry-rooms, porches, stairways, and corridors – produces a compilation of component parts that is original . . . .").

**B.    Copying**

In order to prevail on an infringement claim, a copyright holder must establish that the defendant copied "constituent elements of the work that are original." Feist, 499 U.S. at 361. "Because rarely is there direct evidence of unauthorized duplication, the copyright holder frequently proves copying by showing that the defendant or the person who composed the defendant's work had access to the copyrighted material and that the defendant's work is substantially similar to the

---

[1] The court's determination that the Compass plans on the whole are original, for purposes of the presumptive validity of the copyright under § 410(c), does not preclude defendants from arguing that certain constituent elements of the plans are not original.

protected work." Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 276-77 (6th Cir. 1988).

Compass argues that it has submitted direct evidence of copying. It characterizes the testimony of Mrs. Gesing as an admission that Trinity traced the Compass plans. Compass argues that her admission should lead to a grant of summary judgment in its favor.

The court finds that a jury could reasonably conclude that Mrs. Gesing's testimony does not contain an admission of direct copying. She testified that she used the Compass plans as "something to start with" but maintained that she prepared her February 16, 2012 floor plans with her own hand and did not trace over the Compass plans. Gesing produced sketches that, when overlaid on the Compass plans, contain some dissimilarities from the computer-generated Compass plans. The dissimilarities include slightly different floor and room proportions (Gesing's sketches are not to scale), the addition of a patio and storage area on the first floor, and variations in the arrangement of the master bathroom, master closet and Jack and Jill bathroom on the second floor. In other words, Gesing's sketches are not an exact duplicate of the Compass plans. See Lumetrics, Inc. v. Blalock, 23 F.Supp.3d 138, 145 (W.D.N.Y. 2014) (noting that direct evidence of copying typically involves "exact copying").

At the time she made her hand-drawn sketches, Gesing also sent the Compass plans to someone at Trinity, likely Daniel Thornton, to prepare a "scaled-up" version of the Compass plans. The record before the court does not contain the scaled-up version, nor does it contain deposition testimony or an affidavit from Thornton. It is unclear precisely what Thornton did with the Compass plans, but Vogel's testimony suggests that they possibly were copied into a computer program by Trinity and manipulated or resized to fit them to a desired scale.[2] (Dep. of Vogel at 40). Gesing testified that she drew on top of the scaled-up version in order to bring her floor plans to scale during the process of preparing her March 2, 2012 floor plans. These plans too contain a number of differences from the Compass plans, including slightly different room dimensions, the addition of an exterior door, the elimination of the pocket office and variations in the arrangement of the master bedroom suite and the Jack and Jill bathroom. Her plans contain sufficient dissimilarities from the Compass plans that a jury could reasonably find that she did not directly

---

[2] Compass has not asserted a separate claim regarding any potential technical violation of its copyright that occurred by Trinity copying the Compass plans into its computer system. Cf. Berkla v. Corel Corp., 66 F.Supp.2d 1129, 1145-46 (E.D. Cal. 1999) (defendant conceded a "technical copyright violation" where plaintiff's images were uploaded to defendant's computer system for a beta test version of software; court characterized actual damages as "de minimis").

11

copy the Compass plans. Cf. Berkla, 66 F.Supp.2d at 1140-41 (holding that initial uploading of plaintiff's images onto defendant's computer system for a beta test version of software did not constitute direct evidence of copying for purposes of showing that the defendant's commercially-released software product, which did not contain any exact duplicates of plaintiff's images, infringed plaintiff's copyrights).

Absent direct evidence of copying, a plaintiff may establish "an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999). Here, it is undisputed that the McDermotts and Trinity had access to the Compass plans. Braunsdorf emailed the plans to Mrs. McDermott, who emailed them to Gesing, who in turn provided them to Trinity employees.

"The substantial similarity determination requires comparison not only of the two works' individual elements in isolation, but also of their overall look and feel." Sturdza v. United Arab Emirates, 281 F.3d 1287, 1296 (D.C. Cir. 2002) (internal quotation marks omitted). "[A]n allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Boisson, 273 F.3d at (internal quotation marks and citation omitted). "Put another way, the touchstone of the analysis is the overall similarities rather than the minute differences between the two works." Sturdza, 281 F.3d at 1296 (internal quotation marks omitted).

Compass and the McDermotts both argue that they are entitled to summary judgment on the substantial similarity issue. Compass contends that a side-by-side comparison of its plans and Trinity's July 24, 2012 plans leads to the inescapable conclusion that the plans are "virtually identical." The McDermotts have submitted a list, prepared by Vogel, in which he identified 95 differences that he perceives between the plans. (Doc. 113, Ex. Q).

Courts often observe that "[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." A.A. Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir.1980); accord Wickham v. Knoxville Int'l Energy Exposition, Inc., 739 F.2d 1094, 1097 (6th Cir. 1984) ("[S]ummary judgment . . . is a practice to be used sparingly in copyright infringement cases."); Sturdza, 281 F.3d at 1296.

The court, after conducting a side-by-side comparison of the plans and examining the list of purported differences, readily concludes that the issue of substantially similarity is one best left for determination at trial. Plaintiff is correct in its observation that the plans contain numerous

similarities, many of which could reasonably be said to contribute to the overall look and feel of the home design.  The similarities are most apparent on the first floor, for which the Compass and Trinity plans are the same or similar in the following respects: outside perimeter shape and size, placement of front door, placement of covered porch, number and placement of windows, arrangement of interior walls, room types, room placement, room dimensions, stairway placement, kitchen island placement and shape, fireplace location, and special ceiling types and placement (coffered ceiling in the great room and tray ceilings in the dining and morning rooms).  Close similarities exist on the second floor as well and include: outside perimeter shape and size, number and placement of windows, arrangement of interior walls, room types, placement of bedrooms and bonus room, and tray ceiling in the master bedroom.  The similarities in the floor plans regarding door, window and porch placement translate into similarities as to those elements in the front elevation plans of Compass and Trinity as well.

Defendants are equally correct in their observation that the plans contain numerous dissimilarities, many of which a jury could reasonably conclude rise above the level of trivial or minute differences.  On the first floor, the differences include the Trinity plans having: an additional exterior door, an interior connection between garages, no closet near the front door, no door into the study, a closet in the study, a larger dining room, an opening from the great room into the morning room, no bench in the mudroom, and a utility closet in the mudroom.  The differences on the second floor include the Trinity plans having: different dimensions for the bedrooms, different arrangement of the master bedroom suite, a secondary entry/exit point for the master bedroom suite, different placement of the closets and bathrooms for the other bedrooms, additional linen closets, no clipped ceiling in the bonus room, and a different arrangement of the laundry room.  Defendants also note several differences in the front elevation plans, including the roof lines and Trinity's use of different exterior materials (brick, as opposed to stone and vinyl siding in the Compass plan).

The court thus finds that genuine disputes of material fact exist and that neither side is entitled to summary judgment on the issue of whether the Trinity plans are substantially similar to the Compass plans.  See Sturdza, 281 F.3d at 1299 ("To sum up, we think Demetriou's design, though different in some ways from Sturdza's . . . is sufficiently similar with respect to both individual elements and overall look and feel for a reasonable jury to conclude that the two are substantially similar."); Lifetime Homes, Inc. v. Residential Dev. Corp., 510 F.Supp.2d 794, 805-06 (M.D. Fla. 2007) (denying summary judgment where competing floor plans for single-family home

had some "striking" similarities but defendants had pointed to numerous significant dissimilarities); Bruemmer v. Reardon, No. 1:11-cv-988, 2012 WL 5989355, at * (W.D. Mich. Nov. 29, 2012) (same); Frank Betz, 2010 WL 2253541, at *15 (denying summary judgment in copyright dispute over home designs because the "inherent subjectivity" of the substantial similarity inquiry makes summary judgment on the issue "rarely appropriate").

### C. Availability of Statutory Damages and Attorney's Fees

Defendants argue that Compass is barred as a matter of law from recovering statutory damages and attorney's fees because the Compass plans are an unpublished work and Compass failed to register its copyright prior to the commencement of the alleged infringement. Under the Copyright Act, "no award of statutory damages or of attorney's fees . . . shall be made for . . . any infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. § 412(1).

As a preliminary matter, the court is not persuaded by Compass's suggestion that the floor plans are not an unpublished work. See doc. at 6 n. 6. "Publication of an architectural work occurs when underlying plans or drawings of the building or other copies of the building design are distributed or made available to the general public by sale or other transfer of ownership, or by rental, lease, or lending." 37 C.F.R. § 202.11. Compass has submitted no evidence supporting an inference that it made the plans available to the public. Indeed, the notice of copyright placed on the Compass plans states that the plans are an "unpublished work," and the record before the court establishes that Compass distributed its plans to only the McDermotts.

The Sixth Circuit has stated that § 412(1) "leaves no room for discretion, mandating that no attorney's fees or statutory damages be awarded so long as the infringement commenced before registration of the copyright." Johnson v. Jones, 149 F.3d 494, 505 (6th Cir. 1998). Infringement "commences" under § 412 "when the first act in a series of acts constituting continuing infringement occurs." Id. at 506. Thus, what matters for purposes of § 412 are the "first steps" of infringement and "not the completion" of the infringing work. Cornerstone Home Builders, Inc. v. McAllister, 311 F.Supp.2d 1352, 1352 (M.D. Fla. 2004).

The court finds that Mrs. Gesing's February 16, 2012 floor plans were the first step in a series of acts that led to the allegedly infringing Trinity floor plans of July 24, 2012. It is undisputed that Mrs. Gesing prepared floor plans for Mrs. McDermott and emailed them to her on February 16, 2012. She did this right after Mrs. McDermott had provided her with the Compass plans, which Mrs. Gesing admittedly used as "something to start with." The steps that followed represent a

14

process of modifying and refining the February 16, 2012 plans: Gesing brought her design to scale by using a scaled-up version of the Compass plans, she made alterations based on feedback from Mrs. McDermotts, Trinity converted Gesing's work into computer-generated plans and further refined her plans, culminating in the July 24, 2012 plans that were produced in connection with the application for a construction permit.  See Dorchen/Martin Assocs., Inc. v. Brook of Cheboygan, Inc., No. 11-cv-10561, 2013 WL 140790, at *3 (E.D. Mich. Jan. 11, 2013) (holding that initial copying of building plan commenced the alleged infringement because all of the conduct which followed involved the same plan and "focused towards [the] one goal" of constructing the building); Morgan v. Hawthorne Homes, Inc., No. 04-cv-1809, 2011 WL 2181385, at *3 (W.D. Pa. June 2, 2011) ("Each act of infringement stems from the initial acquisition and copying of Morgan's drawings by Hawthorne Homes, and their later use by the subsidiaries of Hanna Holdings.").

Because Compass did not register its copyright until February 17, 2012 – one day after the alleged infringement commenced – the court finds as a matter of law that Compass is not entitled to an award of statutory damages or attorney's fees.

        **D.**      **Liability of Shirk & O'Donovan**

The final issue before the court on summary judgment concerns the liability of defendant Shirk & O'Donovan, a structural engineering firm that was hired "to prepare red-lined structural drawings in an attempt to achieve structural code conformance for the dwelling" built for the McDermotts.  (Aff. of F. William Shirk, ¶¶ 3,4).  Shirk & O'Donovan reviewed "miscellaneous structural shop drawings" but did not see any reference to Compass or its floor plans.  (Id. at ¶¶ 4, 6).  It was not involved in preparing floor plans, architectural drawings or construction plans for the McDermott residence, nor did it participate in the construction of the residence.  (Id. at ¶¶ 5, 7). Shirk & O'Donovan argues that its role was limited to determining if the structure could support a brick exterior and that it had no role in the allegedly infringing conduct.

In response, Compass offers no additional evidence concerning Shirk & O'Donovan's liability.  Instead it construes Shirk & O'Donovan's statement that it prepared red-lined structural drawings as an admission that the firm participated in the infringement.

The court finds that Compass is making an inference that is not supported by the evidence. When Trinity decided to incorporate brick into the exterior of its design, it sought Shirk & O'Donovan's expertise in determining the "significant structural changes" that would need to be made. (Aff. of Andy Vogel, ¶ 17).  Compass's plans did not call for a brick exterior, and the aspects of the Trinity plans that Compass alleges are infringing are the floor plans and the front elevation

15

view (for which the alleged similarities are limited to the placement and arrangement of windows, doors and porch and of roof lines, rather than materials).  In sum, the record compels the conclusion that Shirk & O'Donovan did not engage in the allegedly infringing conduct.

## IV.     Conclusion

For the reasons stated above, Shirk & O'Donovan's motion for summary judgment as to liability for infringement (doc. 100) is granted.  Trinity and Shirk & O'Donovan's motion for summary judgment as to the availability of an award of statutory damages and attorney's fees (doc. 101) is granted.  The McDermotts' motion for summary judgment (doc. 113) is denied as to the issue of substantial similarity and granted as to the availability of an award of statutory damages and attorney's fees.  Compass's motion for summary judgment (doc. 114) is denied.


                                                            s/ James L. Graham
                                                            JAMES L. GRAHAM
                                                            United States District Judge

DATE: June 21, 2016